# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

**FILED**

JUN 2 3 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**STEPHEN BYRD,**

Plaintiff,

v.

**OPENAI, INC., WALMART INC., and TARGET CORPORATION,**

Defendants.

Case No.: CV 26-06279 AGT

# COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS

## JURY TRIAL DEMANDED

Plaintiff Stephen Byrd, a resident of Maryland, proceeding pro se, alleges as follows for his Complaint against Defendants OpenAI, Inc., Walmart Inc., and Target Corporation:

## DESCRIPTION OF THE TRADE SECRET

1. Plaintiff's trade secret is a proprietary tollbooth monetization architecture—a control layer that sits between voice/conversational interfaces and commerce systems, governing authorization, timing, routing, attribution, and monetization of transactions before fulfillment.

2. This trade secret is defined by its transaction-control sequencing—not by the general concept of an AI shopping assistant, voice commerce, or conversational checkout, all of

which are publicly known industry categories. Plaintiff does not claim ownership of the general category of AI-assisted commerce.

3. Plaintiff's patent portfolio consists of one foundational application and five continuation-in-part applications, with United States Patent and Trademark Office publication dates as follows: Application 18/931,125 ("Core Voice Monetization Engine"), filed October 30, 2024, published February 27, 2025; Application 19/301,951 ("Medical Voice Commerce System"), filed August 16, 2025, published February 19, 2026; Application 19/277,494 ("Voice-Based Monetization System for AI and Virtual Platforms"), filed July 23, 2025, published March 19, 2026; Application 19/321,704 ("In-Content Voice Commerce Engine"), filed September 8, 2025, published March 19, 2026; Application 19/295,646 ("Interactive Offer System with Multilingual AI-Driven Voice Assistant"), filed August 10, 2025, published April 2, 2026; and Application 19/076,711, filed March 11, 2025, which remains unpublished as of the date of this Complaint, as confirmed by its USPTO Patent Application Information Retrieval record reflecting no earliest publication number or date.

4. Each of the disclosure, access, and product-launch events described below—including Plaintiff's February through May 2025 disclosures to Walmart and Target, Walmart's June 6, 2025 launch of Sparky, OpenAI's September 29, 2025 launch of Instant Checkout, and Target's November 19, 2025 launch of its ChatGPT-embedded checkout experience—occurred while five of Plaintiff's six patent applications, including each application containing claims specific to checkout, monetization-routing, and offer-sequencing logic, remained unpublished and unavailable to the public. Only the foundational Application 18/931,125, which does not contain the specific transaction-control logic at issue in this action, was published during this period.

## JURISDICTION AND VENUE

*This action belongs in this District because the California-based technical infrastructure operated by Defendant OpenAI is the specific mechanism through which Plaintiff alleges his architecture was acquired, integrated, and deployed by all three Defendants. OpenAI is headquartered here. Walmart and Target each built direct, substantial technical integrations into OpenAI's California-*

*based commerce systems for the express purpose of operating the very products at issue in this action. The claims in this Complaint do not merely touch California incidentally; they arise directly from technical relationships centered in this District.*

5. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836, with supplemental jurisdiction under 28 U.S.C. § 1367.

6. This Court has general personal jurisdiction over OpenAI, Inc., headquartered in San Francisco, California. Daimler AG v. Bauman, 571 U.S. 117 (2014).

7. This Court has specific personal jurisdiction over Walmart Inc. and Target Corporation because each purposefully directed business activity into this District by entering sustained joint technical development relationships with OpenAI, a California resident, for the specific purpose of building and deploying the conversational commerce systems at issue in this action. These integrations were built and deployed during the same period Plaintiff alleges his architecture was acquired and misappropriated: Walmart's direct technical integration with OpenAI was publicly announced October 14, 2025, with Walmart's own backend—into which Plaintiff alleges his architecture was incorporated—managing fulfillment for purchases completed within OpenAI's ChatGPT interface from that date forward; and Target's integration into OpenAI's Agentic Commerce Protocol, a technical infrastructure operated and maintained by OpenAI from this District, was built throughout 2025 and launched November 19, 2025, the same window during which Target's executives continued accessing Plaintiff's materials. These are not incidental or passive contacts with California; they are the specific, time-correlated technical integrations through which Plaintiff alleges his architecture was acquired and deployed, and Plaintiff's claims arise directly out of them. Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985); Calder v. Jones, 465 U.S. 783 (1984).

8. Venue is proper under 28 U.S.C. § 1391(b)(1)-(2).

## FACTUAL ALLEGATIONS

9. Beginning in February 2025, Plaintiff transmitted technical materials describing his architecture to executives at Walmart Inc. and Target Corporation. Walmart's Executive

Vice President and Chief Merchandising Officer, Latriece Watkins, and Senior Vice President and Controller, David Chojnowski, each accessed these materials 9 times; Executive Vice President and Chief Financial Officer John Rainey accessed them 7 times; Senior Vice President and Chief Marketing Officer William White accessed them 7 times; Executive Vice President and Chief Operating Officer Kieran Shanahan accessed them 6 times; Executive Vice President and Chief Technology Officer Vinod Bidarkoppa accessed them 5 times; and Senior Vice President and Chief Product Officer Tim Simmons accessed them 4 times, with this pattern of access continuing through May 31, 2025.

10. On May 31, 2025, this pattern of access by Walmart's executive leadership stopped entirely. Six days later, on June 6, 2025, Walmart launched its Sparky conversational commerce application.

11. Target Corporation's Executive Vice President, Chief Information and Product Officer, Prat Vemana, accessed Plaintiff's materials 83 times; Executive Vice President and Chief Digital and Revenue Officer Sarah Travis accessed them 41 times; Senior Vice President of Merchandising Amanda Nusz accessed them 34 times; Chairman and Chief Executive Officer Brian Cornell accessed them 28 times; Executive Vice President and Chief Merchandising Officer Jill Sando accessed them 14 times; and incoming Chief Executive Officer Michael Fiddelke accessed them on at least one occasion—with this access continuing for several months beyond the date Walmart's access ceased, and extending into the period during which Target was negotiating and building its own conversational-commerce integration with OpenAI.

12. On November 18, 2025, Plaintiff filed his original action against Defendants in the Eastern District of Virginia and served each Defendant with notice of his ownership claim, including the claims charts described below. Notwithstanding this formal notice, Target's senior executives continued to access Plaintiff's materials after service: Mr. Vemana accessed the materials twice on November 25, 2025, three times on December 16, 2025, and six times on December 18, 2025; Mr. Cornell accessed the materials on December 16 and December 18, 2025; Ms. Travis accessed the materials three times on December 18, 2025; and Ms. Nusz accessed the materials on December 18, 2025. Plaintiff alleges that

this continued access, occurring after Target had actual, formal legal notice of Plaintiff's ownership claim, is independently relevant to willfulness under 18 U.S.C. § 1836(b)(3)(C).

13. During summer 2025, Walmart and Target each entered sustained joint technical development relationships with OpenAI. Target's resulting product—a conversational shopping and checkout experience embedded directly within ChatGPT, distinct from Target's separately launched accessible self-checkout kiosk system—launched in beta on November 19, 2025, integrated into OpenAI's Agentic Commerce Protocol ("ACP").

14. Following Walmart's October 14, 2025 public announcement of its OpenAI partnership, OpenAI's President Greg Brockman accessed Plaintiff's claims-chart materials on October 3, 20, and 29, 2025. Plaintiff alleges that this partnership was not a parallel, independent business arrangement, but a direct technical integration: pursuant to the partnership, Walmart customers can browse, select, and complete purchases entirely within the ChatGPT interface, with Walmart's own systems managing fulfillment, and Walmart's Sparky assistant operates as part of a unified "super agent" architecture sharing a single backend data plane across Walmart's customer-facing, employee-facing, and supplier-facing systems. Plaintiff alleges, on information and belief, that this shared backend—not merely Sparky's consumer-facing recommendation interface—is the system into which Plaintiff's architecture was incorporated, and that this backend is not separately documented in public reporting.

15. Plaintiff alleges that Walmart and Target did not develop their respective commerce-AI systems independently or in parallel, but each integrated directly into the same shared technical infrastructure operated by OpenAI. OpenAI has publicly identified Target, among a defined list of retailers, as having integrated ACP for product discovery and checkout, and has separately confirmed the direct Walmart integration described above. OpenAI thus functioned as the common technical hub through which Plaintiff alleges his architecture, after being acquired through Plaintiff's direct disclosures to Walmart and Target, was incorporated into a single, shared commercial protocol used by all three Defendants, rather than developed by each Defendant in isolation.

16. Plaintiff alleges, on information and belief, that Target's ChatGPT-embedded checkout implementation reflects functional and sequencing characteristics consistent with Plaintiff's architecture, as set forth in the technical comparison below.

17. The forensic access data described above—including 83 discrete opens by Target's Executive Vice President, Chief Information and Product Officer, and sustained access by named executives across Walmart's merchandising, financial, and technology leadership— is offered for two limited purposes: (a) to establish that each Defendant's relevant executives had actual, repeated access to Plaintiff's architecture during the period each Defendant was actively developing the systems described above, and (b) to establish notice supporting willfulness. Plaintiff does not rely on this access data, standing alone, to establish that an implied duty of confidentiality arose or that use or disclosure occurred; those elements are independently supported by the allegations in Paragraphs 9 through 16 and the technical comparison below.

18. Plaintiff further alleges that he took reasonable measures to protect the non-public elements of his architecture. Each of Plaintiff's communications to Defendants' personnel, from February 2025 forward, was directed exclusively to identified senior executives holding licensing, technology-evaluation, or corporate development authority—not to general corporate inboxes, customer service channels, or personnel without decision-making authority—and was sent for the sole, stated purpose of evaluating a potential licensing or business relationship; Plaintiff did not transmit this information for any advertising, marketing, or public-facing purpose. At least eleven of Plaintiff's communications to Defendants' executives, across all three Defendants, contained express confidentiality designations, explicit confidentiality language, or discussion of non-disclosure terms. In addition, beginning in February and continuing through April 2025, Plaintiff's communications to named Walmart and Target executives included links to video demonstrations of Plaintiff's architecture in operation, transmitted as unhyperlinked text requiring the recipient to copy and enter the link directly, rather than as a clickable link, and not otherwise distributed, advertised, or made known to the public. Plaintiff's YouTube analytics for each such video reflect no recorded views in the days immediately preceding transmission to a given executive, followed by a concentrated increase in views beginning

on or immediately after the date of transmission, and a return to no further views shortly thereafter—a pattern Plaintiff alleges is consistent with, and supports the inference of, access by the recipient executive. Plaintiff's September and October 2025 licensing-auction communications further conditioned access to non-public continuation-in-part application materials and architecture-level detail on execution of a confidentiality agreement, while expressly distinguishing that non-public material from information already disclosed through patent publication, which Plaintiff did not treat as confidential. Documents and analytics records reflecting the foregoing are within Plaintiff's possession and will be produced in discovery.

19. Plaintiff further clarifies that, in his September and October 2025 licensing communications, the only WIPO-related content disclosed was the substantive finding reflected in Box No. V of the Written Opinion of the International Searching Authority for PCT/US2025/022223—namely, that Claims 1-10 were found to satisfy novelty, inventive step, and industrial applicability. Plaintiff did not disclose, attach, or describe the substantive 39-page body of the Written Opinion, which was not internationally published by WIPO until May 7, 2026 (WO 2026/095980 A1). To the extent Plaintiff's prior communications described this Box No. V finding using the phrase "public record," Plaintiff clarifies that this referred to the cover-sheet-level patentability finding conveyed to Plaintiff by counsel at the time, and not to the international publication status of the Written Opinion as a whole, which had not yet occurred.

## TECHNICAL COMPARISON

*Plaintiff sets forth below a comparison limited to specific, non-generic transaction-control characteristics, distinguished from generic industry-wide AI assistant functionality which Plaintiff does not claim to own.*

### A. Target — ChatGPT-Embedded Checkout (Launched November 19, 2025)

| Plaintiff's Architecture Element | Target's Public Implementation | Source |
| --- | --- | --- |
| Multi-item transaction sequencing prior to fulfillment-method selection | Ability to purchase multiple items in a single transaction, selecting drive-up, pickup, or shipping | Target Corp. press release, Nov. 19, 2025 |

| Identity-linked authorization preceding transaction routing | Account linking allowing guests to log into Target account to complete purchase within chat | Target Corp. fact sheet, 2026 |
|---|---|---|
| Transaction handled within third-party conversational platform while merchant retains fulfillment control | Complete shopping experience offered directly within ChatGPT interface | Target Corp. press release, Nov. 19, 2025 |
| Multi-platform routing of a single transaction-control architecture across distinct third-party conversational gateways | Target publicly confirms, as of June 18, 2026, that the same underlying checkout architecture now also operates within Google Search/Gemini (via the newly announced Universal Commerce Protocol) and Microsoft Copilot, in addition to ChatGPT | Target Corp. press release, "How Target is Shaping Shopping Experiences in Conversational AI," June 18, 2026 |

*Plaintiff further alleges that this architecture continues to be developed and expanded under the direct, personal direction of the same Target executives identified above as having had extensive access to Plaintiff's materials both before this action was filed and after Defendants were served. As of June 18, 2026, Target's Chief Digital and Revenue Officer Sarah Travis and Chief Information and Product Officer Prat Vemana publicly described, in their own names, Target's strategy of integrating this checkout architecture across multiple AI platforms, stating that Target is "partnering early with leading tech innovators" and "moving with intention—learning quickly, partnering closely." Plaintiff alleges that this continued, expanding deployment, directed by name by the same executives who accessed Plaintiff's materials 83 and 41 times respectively before this action and additional times after service, supports willfulness and ongoing use within the meaning of 18 U.S.C. § 1839(5)(B).*

## B. Walmart — Sparky

*Plaintiff alleges, on information and belief, that Sparky's underlying transaction-control architecture is consistent with Plaintiff's tollbooth monetization architecture, based on the following: (a) Walmart's executive leadership had sustained, repeated access to Plaintiff's architecture through May 31, 2025, immediately before Sparky's launch on June 6, 2025; (b) Sparky does not operate as an isolated consumer interface, but as part of a unified "super agent" system sharing a single backend data plane across Walmart's customer, employee, and supplier-facing systems, the internal transaction-control logic of which is not disclosed in public reporting; and (c) Walmart subsequently integrated this same backend directly into OpenAI's checkout*

*infrastructure, such that Walmart customers complete purchases within the ChatGPT interface while Walmart's backend manages fulfillment. The specific internal sequencing of that backend is uniquely within Walmart's possession and is an appropriate subject of discovery.*

### C. OpenAI — ChatGPT Instant Checkout / Agentic Commerce Protocol

*Plaintiff alleges that OpenAI acquired Plaintiff's architecture, in substance, through its direct technical integration with Walmart and Target rather than through independent development of its own protocol. While OpenAI's Agentic Commerce Protocol is documented, at the merchant-facing level, to route checkout-state control and payment processing to each merchant's own systems, Plaintiff alleges, on information and belief, that the architecture Walmart and Target operate on the merchant side of that protocol—the side controlling authorization, sequencing, and fulfillment—reflects Plaintiff's architecture, acquired from Plaintiff and incorporated by Walmart and Target into the systems they connected to OpenAI's platform. Plaintiff's claim against OpenAI further rests on OpenAI's direct, independent notice of Plaintiff's ownership claim through the materials personally accessed by Mr. Brockman on three separate occasions in October 2025, during the precise period OpenAI was building its integration with Walmart and finalizing Target's onboarding to the Agentic Commerce Protocol, and on OpenAI's continued operation of that integration after such notice.*

### COUNT I

### Misappropriation of Trade Secrets by Improper Acquisition

### (Against All Defendants — 18 U.S.C. § 1836)

20. Plaintiff re-alleges paragraphs 1 through 19.

21. Under 18 U.S.C. § 1839(5)-(6), misappropriation includes acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means, including breach of a duty to maintain secrecy. This theory does not require proof of a pre-existing relationship or any response from Defendants.

22. Plaintiff alleges that Target acquired and implemented architecture consistent with Plaintiff's trade secret, as set forth in the technical comparison above, following extensive, repeated executive access to Plaintiff's materials.

23. Plaintiff alleges that OpenAI acquired Plaintiff's architecture, in substance, through its joint development relationship with Target and Walmart, at a time when OpenAI had direct, independent notice of Plaintiff's ownership claim.

24. As a direct and proximate result, Plaintiff has suffered economic damages, actual loss, and irreparable harm.

## COUNT II

### Misappropriation by Breach of Confidence (Pleaded in the Alternative)

25. Plaintiff re-alleges paragraphs 1 through 24.

26. In the alternative, limited to the September–October 2025 licensing-auction communications, an implied duty of confidentiality arose because those communications were structured to evaluate a licensing relationship and conditioned access to non-public materials on execution of a confidentiality agreement. Thompson v. California Brewing Co., 150 Cal. App. 2d 469, 476 (1957); Smith v. Dravo Corp., 203 F.2d 369, 376-77 (7th Cir. 1953).

27. Plaintiff does not allege that this theory extends to the February–May 2025 unsolicited disclosures standing alone.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, including injunctive relief under 18 U.S.C. § 1836(b)(3)(A); compensatory and unjust enrichment damages under § 1836(b)(3)(B); a reasonable royalty under § 1836(b)(3)(B)(ii); exemplary damages under § 1836(b)(3)(C); attorneys' fees and costs under § 1836(b)(3)(D); and such other relief as the Court deems just.

**JURY TRIAL DEMANDED**

6/22/2026

5506 Woodyard Rd
Upper Marlboro Md. 20772

301-543-9403

Stephenbyrd@voice88ads.com