# FIRST AMENDED COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
STEPHEN BYRD, Plaintiff,
v.
OPENAI FOUNDATION (formerly known as OpenAI, Inc.), WALMART INC., and TARGET CORPORATION, Defendants.
Case No. 3:26-cv-06279-CRB

**FIRST AMENDED COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS**
**JURY TRIAL DEMANDED**
**Plaintiff Stephen Byrd, a resident of Maryland, proceeding pro se, alleges as follows for his First Amended Complaint against Defendants OpenAI Foundation, Walmart Inc., and Target Corporation:**

## DESCRIPTION OF THE TRADE SECRET

1. Plaintiff's trade secret is a proprietary tollbooth monetization architecture: a control layer that sits between voice/conversational interfaces and commerce systems, governing authorization, timing, routing, attribution, and monetization of transactions before fulfillment. When a commercial transaction occurs inside a conversation rather than on a traditional webpage, there is no predefined checkout page, shopping cart, or fixed transaction workflow to guide the process. The backend must instead coordinate a sequence of interdependent steps (identity verification, transaction authorization, state creation and maintenance, routing, merchant handoff, fulfillment, and payment confirmation) in a specific order, where each step depends on the successful completion of the one before it. For example, fulfillment cannot begin until the order has been routed to the correct merchant; routing cannot occur until transaction state has been created and the buyer authorized; and confirmation cannot issue until fulfillment authority has been transferred. Plaintiff's architecture provides that coordination: the specific combination, sequencing, and backend relationships that enable a conversational AI agent to initiate,

control, and complete a real commercial transaction end-to-end within a single conversational interface. No publicly available system, industry standard, or technical documentation provided this coordination as of the dates alleged in this Complaint. Any company seeking to enable real purchases through a conversational AI interface had to solve this specific coordination problem. Plaintiff's architecture provided a working solution. That is what the executives identified in this Complaint were studying when they returned to Plaintiff's materials repeatedly over periods of months: a detailed answer to the engineering challenge their companies were each actively trying to solve.

2. This trade secret is defined by its transaction-control sequencing, not by the general concept of an AI shopping assistant, voice commerce, or conversational checkout, all of which are publicly known industry categories. Plaintiff does not claim ownership of the general category of AI-assisted commerce. The asserted trade secret expressly excludes information actually disclosed in published patent applications, public-facing product functionality, the Box V patentability finding described in Paragraph 19 below, the WIPO Written Opinion, and general AI-commerce concepts.
3. Plaintiff's patent portfolio consists of one foundational application and five continuation-in-part applications, with United States Patent and Trademark Office publication dates as follows: Application 18/931,125 ("Core Voice Monetization Engine"), filed October 30, 2024, published February 27, 2025; Application 19/301,951 ("Medical Voice Commerce System"), filed August 16, 2025, published February 19, 2026; Application 19/277,494 ("Voice-Based Monetization System for AI and Virtual Platforms"), filed July 23, 2025, published March 19, 2026; Application 19/321,704 ("In-Content Voice Commerce Engine"), filed September 8, 2025, published March 19, 2026; Application 19/295,646 ("Interactive Offer System with Multilingual AI-Driven Voice Assistant"), filed August 10, 2025, published April 2, 2026; and Application 19/076,711, filed March 11, 2025, which remains unpublished as of the date of this Complaint, as confirmed by its USPTO Patent Application Information Retrieval record reflecting no earliest publication number or date.
4. Each of the disclosure, access, and product-launch events described below, including Plaintiff's February through May 2025 disclosures to Walmart and Target, Walmart's June 6, 2025 launch of Sparky, OpenAI's

September 29, 2025 launch of Instant Checkout, and Target's November 19, 2025 launch of its ChatGPT-embedded checkout experience, occurred while five of Plaintiff's six patent applications, including each application containing claims specific to checkout, monetization-routing, and offer-sequencing logic, remained unpublished and unavailable to the public. Only the foundational Application 18/931,125, which does not contain the specific transaction-control logic at issue in this action, was published during this period.

## JURISDICTION AND VENUE

This action belongs in this District because the California-based technical infrastructure operated by Defendant OpenAI Foundation is the specific mechanism through which Plaintiff alleges his architecture was acquired, integrated, and deployed by all three Defendants. OpenAI Foundation is headquartered here. Walmart and Target each built direct, substantial technical integrations into OpenAI's California-based commerce systems for the express purpose of operating the very products at issue in this action. The claims in this Complaint do not merely touch California incidentally; they arise directly from technical relationships centered in this District.

5. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. Section 1331 and 18 U.S.C. Section 1836, with supplemental jurisdiction under 28 U.S.C. Section 1367.
6. This Court has general personal jurisdiction over OpenAI Foundation, headquartered in San Francisco, California. *Daimler AG v. Bauman*, 571 U.S. 117 (2014).
7. This Court has specific personal jurisdiction over Walmart Inc. and Target Corporation because each purposefully directed business activity into this District by entering sustained joint technical development relationships with OpenAI Foundation, a California resident, for the specific purpose of building and deploying the conversational commerce systems at issue in this action. These integrations were built and deployed during the same period Plaintiff alleges his architecture was acquired and misappropriated: Walmart's direct technical integration with OpenAI was publicly announced October 14, 2025, with Walmart's own backend, into which Plaintiff alleges his architecture was incorporated, managing fulfillment for purchases completed within OpenAI's ChatGPT interface from that date forward; and Target's integration into OpenAI's Agentic Commerce Protocol, a technical

infrastructure operated and maintained by OpenAI from this District, was built throughout 2025 and launched November 19, 2025, the same window during which Target's executives continued accessing Plaintiff's materials. These are not incidental or passive contacts with California; they are the specific, time-correlated technical integrations through which Plaintiff alleges his architecture was acquired and deployed, and Plaintiff's claims arise directly out of them. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *Calder v. Jones*, 465 U.S. 783 (1984).

8. Venue is proper under 28 U.S.C. Section 1391(b)(1)-(2).

FACTUAL ALLEGATIONS

9. Beginning in February 2025, Plaintiff transmitted technical materials to executives at Walmart Inc. and Target Corporation. Those materials identified the specific transaction-control sequencing, authorization pathways, routing logic, attribution mechanisms, and monetization-control relationships comprising the nonpublic implementation architecture described in Paragraphs 1 and 2 above, and were transmitted for the sole, stated purpose of evaluating a potential licensing or business relationship. Walmart's Executive Vice President and Chief Merchandising Officer, Latriece Watkins, and Senior Vice President and Controller, David Chojnowski, each accessed these materials 9 times; Executive Vice President and Chief Financial Officer John Rainey accessed them 7 times; Senior Vice President and Chief Marketing Officer William White accessed them 7 times; Executive Vice President and Chief Operating Officer Kieran Shanahan accessed them 6 times; Executive Vice President and Chief Technology Officer Vinod Bidarkoppa accessed them 5 times; and Senior Vice President and Chief Product Officer Tim Simmons accessed them 4 times, with this pattern of access continuing through May 31, 2025.

10. On May 31, 2025, this pattern of access by Walmart's executive leadership stopped entirely. Six days later, on June 6, 2025, Walmart launched its Sparky conversational commerce application, whose publicly described multi-agent orchestration architecture is set forth in the technical comparison below. Two days before that final access date, on May 29, 2025, Walmart had publicly described an architecture in which specialized agents "perform specific tasks" whose outputs are "stitched together to orchestrate and solve complex workflows" spanning discovery through checkout. Walmart Global Tech Blog, May 29, 2025.

11. Target Corporation's Executive Vice President, Chief Information and Product Officer, Prat Vemana, accessed Plaintiff's materials 83 times; Executive Vice President and Chief Digital and Revenue Officer Sarah Travis accessed them 41 times; Senior Vice President of Merchandising Amanda Nusz accessed them 34 times; Chairman and Chief Executive Officer Brian Cornell accessed them 28 times; Executive Vice President and Chief Merchandising Officer Jill Sando accessed them 14 times; and incoming Chief Executive Officer Michael Fiddelke accessed them on at least one occasion, with this access continuing for several months beyond the date Walmart's access ceased, and extending into the period during which Target was negotiating and building its own conversational-commerce integration with OpenAI.

12. On November 18, 2025, Plaintiff filed his original action against Defendants in the Eastern District of Virginia. Target Corporation was served on November 20, 2025, and Walmart Inc. was served on November 21, 2025. Notwithstanding this formal legal notice of Plaintiff's ownership claim, Target's senior executives continued to access Plaintiff's materials after service: Mr. Vemana accessed the materials twice on November 25, 2025, three times on December 16, 2025, and six times on December 18, 2025; Mr. Cornell accessed the materials on December 16 and December 18, 2025; Ms. Travis accessed the materials three times on December 18, 2025; Ms. Nusz accessed the materials on December 18, 2025; and Mr. Fiddelke accessed the materials on December 18, 2025. Each of these executives held operational, technology, product, merchandising, or corporate-leadership responsibilities, not legal or compliance functions. Plaintiff alleges that this continued access by business executives, occurring after Target had actual, formal legal notice of Plaintiff's ownership claim, is independently relevant to willfulness under 18 U.S.C. Section 1836(b)(3)(C) and supports the inference that the post-service access was for operational or evaluative purposes rather than legal review.

13. During summer 2025, Walmart and Target each entered sustained joint technical development relationships with OpenAI. Target's resulting product, a conversational shopping and checkout experience embedded directly within ChatGPT, distinct from Target's separately launched accessible self-checkout kiosk system, launched in beta on November 19, 2025, integrated into OpenAI's Agentic Commerce Protocol ("ACP").

14. On October 3, 2025, Plaintiff transmitted a communication to OpenAI via both email and FedEx certified mail, addressed to OpenAI's Vice President and General Counsel, Che Chang, and its Chief Executive Officer, Sam Altman. That communication included a claims chart mapping specific claim elements from Plaintiff's then-unpublished Application 19/277,494 to publicly observable features of OpenAI's ChatGPT Instant Checkout, and expressly invited a confidential introductory call to discuss Plaintiff's portfolio. OpenAI's President, Greg Brockman, accessed these materials twice the same day, opening the communication at 6:16 p.m. and returning to it at 6:57 p.m. On October 20, 2025, Plaintiff transmitted a second communication expressly marked "URGENT & CONFIDENTIAL," addressed to General Counsel Chang and directed to CEO Altman and President Brockman, referencing specific applications from Plaintiff's portfolio, including then-unpublished Application 19/295,646, and their relevance to Instant Checkout and the Walmart-OpenAI partnership. Mr. Brockman accessed that communication the same day. Mr. Brockman accessed Plaintiff's materials a fourth time on October 29, 2025. The first of these accesses, October 3, occurred eleven days before Walmart's October 14, 2025 public announcement of its OpenAI partnership, and the subsequent accesses continued through the end of that month during the period in which OpenAI was developing and integrating commerce infrastructure with Walmart and Target. Plaintiff alleges that the Walmart-OpenAI partnership was not a parallel, independent business arrangement, but a direct technical integration: pursuant to the partnership, Walmart customers can browse, select, and complete purchases entirely within the ChatGPT interface, with Walmart's own systems managing fulfillment, and Walmart's Sparky assistant operates as part of a unified "super agent" architecture sharing a single backend data plane across Walmart's customer-facing, employee-facing, and supplier-facing systems. Plaintiff alleges, on information and belief, that this shared backend, not merely Sparky's consumer-facing recommendation interface, is the system into which Plaintiff's architecture was incorporated, and that this backend is not separately documented in public reporting.

15. Plaintiff alleges that Walmart and Target did not develop their respective commerce-AI systems independently or in parallel, but each integrated directly into the same shared technical infrastructure operated by OpenAI. OpenAI has publicly identified Target, among a defined list of retailers, as

having integrated ACP for product discovery and checkout, and has separately confirmed the direct Walmart integration described above. OpenAI thus functioned as the common technical hub through which Plaintiff alleges his architecture, after being acquired through Plaintiff's direct disclosures to Walmart and Target, was incorporated into a single, shared commercial protocol used by all three Defendants, rather than developed by each Defendant in isolation.

16. Plaintiff alleges, on information and belief, that Target's ChatGPT-embedded checkout implementation reflects functional and sequencing characteristics consistent with Plaintiff's architecture, as set forth in the technical comparison below.

17. The forensic access data described above, including 83 discrete opens by Target's Executive Vice President, Chief Information and Product Officer, and sustained access by named executives across Walmart's merchandising, financial, and technology leadership, is offered for two limited purposes: (a) to establish that each Defendant's relevant executives had actual, repeated access to Plaintiff's architecture during the period each Defendant was actively developing the systems described above, and (b) to establish notice supporting willfulness. Plaintiff does not rely on this access data, standing alone, to establish that an implied duty of confidentiality arose or that use or disclosure occurred; those elements are independently supported by the allegations in Paragraphs 9 through 16 and the technical comparison below. Plaintiff further alleges that the sustained pattern of re-access is significant on its own terms. Chief executive officers, chief technology officers, chief information and product officers, and chief financial officers at two of the largest companies in the United States do not return to the same materials dozens of times, across periods of months, unless those materials contain information directly relevant to something they are building. Each Defendant was actively developing a conversational commerce system during the precise months its executives were returning to Plaintiff's materials. No publicly available source provided the transaction-control coordination those systems required. Target's own Chief Information and Product Officer publicly acknowledged on November 25, 2025, that there was "no existing blueprint for agentic commerce," on the same day he accessed Plaintiff's materials for the first time after service of this lawsuit. The re-access pattern, the seniority of the executives involved, the correlation to each Defendant's

product-development timeline, and the absence of any public alternative together support the plausible inference that these executives returned to Plaintiff's materials because the architecture described in those materials was directly useful to the systems they were building.

## REASONABLE MEASURES TO PROTECT SECRECY

18. Plaintiff further alleges that he took reasonable measures to protect the non-public elements of his architecture. Each of Plaintiff's communications to Defendants' personnel, from February 2025 forward, was directed exclusively to identified senior executives holding licensing, technology-evaluation, or corporate development authority, not to general corporate inboxes, customer service channels, or personnel without decision-making authority, and was sent for the sole, stated purpose of evaluating a potential licensing or business relationship; Plaintiff did not transmit this information for any advertising, marketing, or public-facing purpose. At least eleven of Plaintiff's communications to Defendants' executives, across all three Defendants, contained express confidentiality designations, explicit confidentiality language, or discussion of non-disclosure terms. Communications directed specifically to OpenAI bore such designations: the October 20, 2025 communication to OpenAI's General Counsel, Chief Executive Officer, and President was expressly marked "URGENT & CONFIDENTIAL," and the October 3, 2025 communication to the same officers expressly invited a confidential introductory discussion, as described in Paragraph 14. In addition, beginning in February and continuing through April 2025, Plaintiff's communications to named Walmart and Target executives included links to video demonstrations of Plaintiff's architecture in operation, transmitted as unhyperlinked text requiring the recipient to copy and enter the link directly, rather than as a clickable link, and not otherwise distributed, advertised, or made known to the public. Plaintiff's YouTube analytics for each such video reflect no recorded views in the days immediately preceding transmission to a given executive, followed by a concentrated increase in views beginning on or immediately after the date of transmission, and a return to no further views shortly thereafter, a pattern Plaintiff alleges is consistent with, and supports the inference of, access by the recipient executive.

19. Plaintiff's September and October 2025 licensing communications employed a tiered disclosure structure that distinguished publicly available

information from nonpublic implementation materials. Evaluation-level information, including the published foundational patent application, the Box V patentability finding described in Paragraph 20 below, and scope descriptions of the continuation-in-part applications sufficient for portfolio assessment, was provided without requiring execution of a confidentiality agreement, as that information was derived primarily from publicly available sources and did not include the nonpublic implementation logic, transaction-control sequencing, or backend interrelationships comprising the trade secret alleged in this action. Because Plaintiff's portfolio consists of continuation-in-part applications, the publicly available information from the published foundational application provided sufficient context for an executive to determine whether a licensing discussion was warranted without access to the nonpublic implementation details. When Plaintiff's licensing communications stated that no nondisclosure agreement was needed to evaluate the portfolio, Plaintiff was referring specifically to these evaluation-level materials: the published foundational application, the Box V patentability finding, and scope descriptions of the continuation-in-part applications. Plaintiff did not state, and his communications do not reflect, that all of his information was publicly available or that no confidentiality protections applied to any of his materials. To the contrary, access to the full, unpublished continuation-in-part application texts and the detailed implementation architecture, the specific combination, sequencing, and backend interrelationships described in Paragraphs 1 and 2 that comprise the trade secret, was expressly conditioned on execution of an attached confidentiality agreement. This tiered structure reflected Plaintiff's deliberate separation of publicly available information, which Plaintiff did not treat as confidential, from nonpublic implementation materials, which Plaintiff expressly restricted. Documents and records reflecting the foregoing are within Plaintiff's possession and will be produced in discovery. Plaintiff further alleges that the unsolicited nature of his initial communications does not eliminate protection for the nonpublic content they contained. Neither the Defend Trade Secrets Act, 18 U.S.C. Section 1836, nor any provision of federal trade secret law requires execution of a nondisclosure agreement as a precondition for trade secret protection. The statute requires that the trade secret owner took "reasonable measures to keep such information secret." 18 U.S.C. Section 1839(3)(A). Reasonable measures are assessed based on the totality of the circumstances, not the

presence or absence of any single safeguard. Each communication was directed to a specifically identified senior executive with licensing, technology, or corporate-development authority, not to the general public or to undifferentiated recipients. The recipients were not strangers chosen at random; they were the specific executives at each company with authority over the business decisions relevant to the architecture. At least eleven communications bore express confidentiality designations. Access to the full implementation architecture was expressly conditioned on execution of a confidentiality agreement. These measures, taken together, placed each recipient on actual notice that the nonpublic content was confidential and that it was transmitted for the limited purpose of licensing evaluation, not for unrestricted use.

20. Plaintiff further clarifies that, in his September and October 2025 licensing communications, the only WIPO-related content disclosed was the substantive finding reflected in Box No. V of the Written Opinion of the International Searching Authority for PCT/US2025/022223, namely, that Claims 1-10 were found to satisfy novelty, inventive step, and industrial applicability. Plaintiff did not disclose, attach, or describe the substantive 39-page body of the Written Opinion, which was not internationally published by WIPO until May 7, 2026 (WO 2026/095980 A1). To the extent Plaintiff's prior communications described this Box No. V finding using the phrase "public record," Plaintiff clarifies that this referred to the cover-sheet-level patentability finding conveyed to Plaintiff by counsel at the time, and not to the international publication status of the Written Opinion as a whole, which had not yet occurred.

## ECONOMIC VALUE

21. The nonpublic implementation architecture described in Paragraphs 1 and 2 derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use. 18 U.S.C. Section 1839(3)(B). The engineering challenge described in Paragraph 1, coordinating interdependent backend functions in the correct sequence within a conversational interface where no fixed transaction workflow exists, is a problem every company building conversational commerce must solve. A person with access to a working architecture for that coordination obtains a direct competitive advantage

over one who must solve the problem independently. The sustained pattern of executive re-access described in Paragraphs 9 through 12 is itself evidence of that value: information that C-suite executives at two of the largest companies in the United States return to repeatedly over months, and continue accessing even after being served with a lawsuit alleging the owner's rights in it, is not information those executives considered worthless or publicly available. The re-access pattern corroborates the economic value of the architecture independently of Plaintiff's own characterization. That value derived from the secrecy of the nonpublic architecture in the following respects:

(a) The architecture solved specific engineering challenges in coordinating identity-linked authorization, transaction-state creation, routing, attribution, monetization control, merchant handoff, fulfillment, and transaction confirmation within a single system operating across multiple third-party conversational platforms. Independent design of equivalent transaction-control sequencing, determining the correct ordering, dependencies, and handoff conditions among those functions, would require substantial investment in engineering, development, and testing. A person with access to the nonpublic implementation logic could replicate or approximate those sequencing relationships without incurring that independent development cost.

(b) The architecture provided development-time advantages to any entity with access to the nonpublic implementation logic. The timing alleged in this Complaint, including Walmart's launch of Sparky six days after its executives' final recorded access to Plaintiff's materials, and Target's deployment of its ChatGPT-embedded checkout during the period of ongoing executive access, supports the inference that the architecture enabled development and deployment on a timeline that would not have been achievable through independent engineering alone.

(c) The nonpublic implementation architecture represented competitive intelligence in the emerging market for AI-integrated conversational commerce. The specific transaction-control sequencing, routing logic, and backend interrelationships that comprise the trade secret, as distinguished from the publicly known general concept of AI-assisted commerce, were not derivable from publicly available materials, including the published foundational patent application, which does not contain the specific transaction-control logic at issue in this action.

(d) The architecture's commercial utility was demonstrated by each Defendant's subsequent deployment of conversational-commerce systems with transaction-control characteristics corresponding to the architecture, and by Target's subsequent expansion of that same implementation across multiple third-party AI platforms, including ChatGPT, Google Search/Gemini, and Microsoft Copilot.

22. The specific implementation logic, sequencing, and interrelationships comprising the nonpublic architecture were not generally known within the conversational-commerce industry and were not readily ascertainable through proper means. The publicly available materials, including the published foundational patent application, public product announcements, and public-facing product functionality, disclosed, at most, the general concept of AI-assisted commerce and selected outward features. They did not disclose the internal transaction-control sequencing, routing logic, authorization pathways, monetization-control relationships, or backend handoff conditions comprising the asserted trade secret. The backend logic is not exposed through any Defendant's user-facing interface and could not be reverse engineered from observing the public-facing functionality of Defendants' conversational-commerce systems.

## TECHNICAL COMPARISON

Plaintiff sets forth below a comparison limited to specific, non-generic transaction-control characteristics, distinguished from generic industry-wide AI assistant functionality which Plaintiff does not claim to own.

### A. Target: ChatGPT-Embedded Checkout (Launched November 19, 2025)

| Plaintiff's Architecture Element | Target's Public Implementation | Source |
|---|---|---|
| Multi-item transaction sequencing prior to fulfillment-method selection | Ability to purchase multiple items in a single transaction, selecting drive-up, pickup, or shipping | Target Corp. press release, Nov. 19, 2025 |

| | | |
|---|---|---|
| Identity-linked authorization preceding transaction routing | Account linking allowing guests to log into Target account to complete purchase within chat | Target Corp. fact sheet, 2026 |
| Transaction handled within third-party conversational platform while merchant retains fulfillment control | Complete shopping experience offered directly within ChatGPT interface | Target Corp. press release, Nov. 19, 2025 |
| Multi-platform routing of a single transaction-control architecture across distinct third-party conversational gateways | Target publicly confirms, as of June 18, 2026, that the same underlying checkout architecture now also operates within Google Search/Gemini (via the newly announced Universal Commerce Protocol) and Microsoft Copilot, in addition to ChatGPT | Target Corp. press release, "How Target is Shaping Shopping Experiences in Conversational AI," June 18, 2026 |

Plaintiff further alleges that this architecture continues to be developed and expanded under the direct, personal direction of the same Target executives identified above as having had extensive access to Plaintiff's materials both before this action was filed and after Defendants were served. As of June 18, 2026, Target's Chief Digital and Revenue Officer Sarah Travis and Chief Information and Product Officer Prat Vemana publicly described, in their own names, Target's strategy of integrating this checkout architecture across multiple AI platforms, stating that Target is "partnering early with leading tech innovators" and "moving with intention, learning quickly, partnering closely." Plaintiff alleges that this continued, expanding deployment, directed by name by the same executives who accessed Plaintiff's materials 83 and 41 times respectively before this action and additional times after service, supports willfulness and ongoing use within the meaning of 18 U.S.C. Section 1839(5)(B).

On November 25, 2025, five days after Target was served with Plaintiff's Complaint and on the same date Mr. Vemana accessed Plaintiff's materials for

the first time after service, a Target executive publicly described the development of Target's agentic commerce architecture as proceeding in "the absence of an existing blueprint for agentic commerce," while the development team was "building and testing new versions multiple times a day." Target Corp. public statement, Nov. 25, 2025. Plaintiff alleges that the acknowledged absence of a publicly available blueprint for the system-level architecture at issue is consistent with the non-ascertainability of Plaintiff's trade secret and with the economic value allegations set forth in Paragraphs 21 and 22 above.

### B. Walmart: Sparky and Agentic Commerce Architecture

The public record reflects a progression in the scope of Walmart's publicly described AI-commerce capabilities corresponding to the period of executive access to Plaintiff's materials. Before February 2025, Walmart's public announcements described AI-powered search, shopping recommendations, and customer-recognition features operating at the consumer-interface level. See, e.g., Walmart Corp. product announcements, October 2023 (AI-powered search and complex-purchase assistance), June 2024 (generative-AI shopping assistant for recommendations, comparisons, and replenishment), October 2024 (proprietary generative-AI platforms for customer recognition, order management, and return management). Beginning in March 2025, during the period of executive access to Plaintiff's materials described in Paragraphs 9 and 10, Walmart publicly described system-level coordination of specialized functions across the full transaction lifecycle, from discovery through checkout through fulfillment, with characteristics corresponding to the specific combination and sequencing elements of Plaintiff's trade secret. Plaintiff sets forth below a comparison of specific, publicly described characteristics of Walmart's systems with corresponding elements of Plaintiff's trade secret.

| Plaintiff's Architecture Element | Walmart's Public Description | Source |
|---|---|---|
| Identity-linked authorization governing transaction initiation | Customer login enabling Sparky to initiate and manage the commerce journey on the identified user's behalf | Walmart Corp., Sparky product description, 2025 |

| | | |
|---|---|---|
| Transaction-state creation and maintenance across multi-step purchase sequence | Purchase journey coordinated from "discovery through checkout"; basket and list management across multi-step sequence | Walmart Corp., product description, 2025; Walmart Global Tech Blog, May 29, 2025 |
| Routing logic coordinating fulfillment across methods and locations | AI-driven delivery-zone optimization, fulfillment-method routing, and multi-location fulfillment coordination; Sparky "connects digital intent to fulfillment" | Walmart Corp., fulfillment infrastructure announcement, Apr. 16, 2025; Walmart Corp., product description, 2025 |
| Attribution and monetization control within commerce architecture | Advertising served within Sparky's conversational commerce environment | Walmart Corp., 2025 |
| Merchant handoff and fulfillment authority | "Chat to planning to buying ... Walmart handles the rest"; Walmart's backend manages fulfillment for purchases completed within the ChatGPT interface | OpenAI / Walmart Corp. partnership announcement, Oct. 14, 2025 |
| Multi-agent orchestration of specialized functions into unified transaction workflow | Agents "perform specific tasks" whose outputs are "stitched together to orchestrate and solve complex workflows" | Walmart Global Tech Blog, May 29, 2025 |

Plaintiff further alleges that Sparky does not operate as an isolated consumer interface, but as part of a unified "super agent" architecture sharing a single backend data plane across Walmart's customer-facing, employee-facing, and

supplier-facing systems, the internal transaction-control logic of which is not disclosed in public reporting and is uniquely within Walmart's possession. Plaintiff does not allege that the publicly described characteristics set forth above, standing alone, establish that Walmart incorporated Plaintiff's architecture. Plaintiff alleges that these characteristics, together with the access chronology described in Paragraphs 9 and 10 and the progression from consumer-interface-level AI features to system-level transaction architecture corresponding to Plaintiff's trade secret during the period of executive access, establish a factual basis warranting discovery into Walmart's internal development records, architecture documentation, and retention records.

### C. OpenAI: ChatGPT Instant Checkout / Agentic Commerce Protocol

On September 29, 2025, OpenAI publicly launched Instant Checkout and described the Agentic Commerce Protocol transaction sequence as follows: an AI agent initiates a transaction; the user authorizes the transaction; order, shipping, and payment details are assembled and transmitted to the merchant's backend; payment is processed; the merchant handles fulfillment; and the merchant provides post-transaction support. OpenAI, Instant Checkout announcement, Sept. 29, 2025. On March 24, 2026, OpenAI further described the Agentic Commerce Protocol as a "connective layer between merchants and users." OpenAI, Mar. 24, 2026. Plaintiff sets forth below a comparison of that publicly described transaction sequence with corresponding elements of Plaintiff's trade secret.

| Plaintiff's Architecture Element | OpenAI's Public Description | Source |
|---|---|---|
| Control layer between conversational interface and commerce systems | ACP described as "connective layer between merchants and users" | OpenAI, Mar. 24, 2026 |
| Identity-linked authorization governing transaction initiation | User authorizes the transaction; merchant and account information passed securely | OpenAI, Instant Checkout announcement, Sept. 29, 2025 |

| | | |
|---|---|---|
| Transaction-state creation and transmission to merchant | Order, shipping, and payment details assembled and transmitted to merchant backend | OpenAI, Instant Checkout announcement, Sept. 29, 2025 |
| Routing to merchant backend for fulfillment | Merchant backend receives complete order information via ACP | OpenAI, Instant Checkout announcement, Sept. 29, 2025 |
| Merchant handoff and fulfillment authority | Merchant remains merchant of record; merchant handles fulfillment and returns | OpenAI, ACP documentation, 2025-2026 |
| Payment processing and transaction confirmation | Payment processed through Instant Checkout; payment tokens transmitted to merchant | OpenAI, Instant Checkout announcement, Sept. 29, 2025 |

Plaintiff alleges that OpenAI acquired Plaintiff's architecture, in substance, through its direct technical integration with Walmart and Target rather than through independent development of the Agentic Commerce Protocol. While the Protocol is documented, at the merchant-facing level, to route checkout-state control and payment processing to each merchant's own systems, Plaintiff alleges, on information and belief, that the architecture Walmart and Target operate on the merchant side of that Protocol, the side controlling authorization, sequencing, and fulfillment, reflects Plaintiff's architecture, acquired from Plaintiff and incorporated by Walmart and Target into the systems they connected to OpenAI's platform. Plaintiff's claim against OpenAI further rests on OpenAI's direct, independent notice of Plaintiff's ownership claim through the materials personally accessed by Mr. Brockman on four occasions across three dates in October 2025, during the precise period OpenAI was building its integration with Walmart and finalizing Target's onboarding to the Agentic Commerce Protocol, and on OpenAI's continued operation of that integration after such notice.

COUNT I: Misappropriation of Trade Secrets (Against All Defendants: 18 U.S.C. Section 1836)

23. Plaintiff re-alleges Paragraphs 1 through 22.

24. Under 18 U.S.C. Section 1839(5)-(6), misappropriation includes: (i) acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means, including breach or inducement of a breach of a duty to maintain secrecy; and (ii) use or disclosure of a trade secret by a person who, at the time of use or disclosure, knew or had reason to know the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Plaintiff's materials were transmitted for the limited purposes of licensing evaluation and potential business discussions, not for unrestricted copying, internal dissemination beyond the evaluation, incorporation into commercial systems, or disclosure to third parties. Use or disclosure exceeding those limited purposes constitutes misappropriation regardless of whether the initial receipt was voluntary. This theory does not require proof of a pre-existing contractual relationship or any response from Defendants. The voluntary nature of Plaintiff's initial disclosures does not negate misappropriation. A recipient who receives confidential technical materials for a stated, limited purpose and then incorporates the described architecture into commercial systems without authorization has exceeded the scope of that limited purpose. The question under the statute is not how the materials arrived; it is what the recipient did with them after they arrived. Here, each Defendant's executives received materials describing a specific transaction-control architecture, accessed those materials repeatedly during the months each Defendant was building a conversational-commerce system, and then deployed systems whose publicly described characteristics correspond to that architecture, as set forth in the technical comparisons above. Whether Defendants in fact used the architecture internally is a question that can only be answered through discovery into Defendants' development records, retention procedures, and internal communications, which are in Defendants' exclusive possession.

25. Plaintiff alleges that Target acquired and implemented architecture consistent with Plaintiff's trade secret, as set forth in the technical comparison above, following extensive, repeated executive access to

Plaintiff's materials, and that Target continued to access and use Plaintiff's materials after receiving formal legal notice of Plaintiff's ownership claim.

26. Plaintiff alleges that Walmart acquired and implemented architecture consistent with Plaintiff's trade secret, as set forth in the technical comparison above, following sustained executive access to Plaintiff's materials through May 31, 2025, and launched its Sparky conversational commerce application six days later on June 6, 2025. The specific internal sequencing of Sparky's backend transaction-control architecture is uniquely within Walmart's possession.

27. Plaintiff alleges that OpenAI acquired Plaintiff's architecture, in substance, through its joint development relationship with Target and Walmart, at a time when OpenAI had direct, independent notice of Plaintiff's ownership claim through Greg Brockman's repeated access to Plaintiff's claims-chart materials in October 2025.

28. As a direct and proximate result, Plaintiff has suffered economic damages, actual loss, and irreparable harm, including but not limited to loss of the economic value derived from secrecy of the nonpublic architecture, loss of licensing opportunities, unjust enrichment of Defendants through the use of Plaintiff's nonpublic architecture in their commercial products, and ongoing harm from Defendants' continued deployment and expansion of systems incorporating Plaintiff's architecture.

## COUNT II: Misappropriation by Breach of Confidence (Pleaded in the Alternative)

29. Plaintiff re-alleges Paragraphs 1 through 28.

30. In the alternative, limited to the September-October 2025 licensing communications, an implied duty of confidentiality arose because those communications were structured to evaluate a licensing relationship and expressly conditioned access to nonpublic materials on execution of a confidentiality agreement. *Thompson v. California Brewing Co.*, 150 Cal. App. 2d 469, 476 (1957); *Smith v. Dravo Corp.*, 203 F.2d 369, 376-77 (7th Cir. 1953).

31. Plaintiff does not allege that this theory extends to the February-May 2025 disclosures standing alone.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, including injunctive relief under 18 U.S.C. Section 1836(b)(3)(A); compensatory

and unjust enrichment damages under Section 1836(b)(3)(B); a reasonable royalty under Section 1836(b)(3)(B)(ii); exemplary damages under Section 1836(b)(3)(C); attorneys' fees and costs under Section 1836(b)(3)(D); and such other relief as the Court deems just.

JURY TRIAL DEMANDED

Dated: October 18, 2026

Respectfully submitted,

/s/ Stephen Byrd

---

STEPHEN BYRD
5506 Woodyard Road
Upper Marlboro, Maryland 20772
stephenbyrd@voiceeads.com
Plaintiff, Pro Se